Hillmann v. City of Chicago Ms. Masterson Good morning, and may it please the court This morning, I'm going to focus on three issues. Reinstatement of the verdict in Hillmann 1, J.N.O.V. in Hillmann 2, and Remediter in Hillmann 2. Beginning with Hillmann 1 and reinstatement, Judge Castillo's new trial ruling should be reversed as to the jury claims and the verdict reinstated. Judge Castillo ordered a new trial based upon his conclusion that Judge Hibbler's ruling allowing Sullivan and Drumgold to invoke the Fifth Amendment and Judge Hibbler's subsequent failure to give an adverse inference instruction were error. Because Judge Castillo was a substitute judge, his new trial ruling is not entitled to deference under this court's precedent such as bank card Americans. Mr. Hillmann argued in favor of Judge Hibbler's ruling allowing Mr. Sullivan and Drumgold to invoke the Fifth Amendment and having gotten the ruling he asked for, any error was invited by Hillmann and not a basis for a new trial. Further, as we explain in our brief, Judge Hibbler did not commit error. His rulings were not an abuse of discretion right for reversal by Judge Castillo. Nor does Mr. Hillmann's argument regarding an adverse inference instruction fare any better. First and foremost, Mr. Hillmann never submitted an adverse inference instruction to Judge Hibbler, despite representing to Judge Castillo that he had. And for that reason alone, he failed to preserve error and was not entitled to a new trial. And in any event, Judge Hibbler did not abuse his discretion when he held he would not give an adverse inference. Mr. Hillmann himself posited three reasons for the witnesses' invocation of the Fifth Amendment. These were patronage issues, the ADA, and the workers' comp claims. And Judge Hibbler would have been familiar with the record, which included excerpts from the criminal patronage trials involving Streets and Sands and specifically showed in a proffer that a supervising timekeeper was spared the riff because she was a member of the Hispanic Democratic Organization. Given the multiple reasons that were before Judge Hibbler as to why the witnesses might be invoking the Fifth Amendment, he did not abuse his discretion in allowing an adverse inference as to two of them. And in fact, no case law holds otherwise. For these reasons, the verdict in Hillmann won should be reinstated. I don't understand this to be a fight about whether the witnesses had a valid Fifth Amendment privilege in the circumstances, but a fight about the procedure in which the privilege was invoked according to the case law about how that is to happen in a civil case. In other words, in front of the jury on a question-by-question basis with an adverse inference instruction so that the jury can evaluate the fact of the invocation of the privilege and to authorize this in a blanket way so that the witnesses don't even have to come to court is contrary to law. That's what I understand the procedural fight to be about, not about whether they had a valid privilege to invoke. Well, Evans and Harris, which are the two cases relied upon, we believe don't support what happened here, which is that the plaintiff, in this case Mr. Hillmann, actually asked that the witnesses be able to have blanket invocation of the Fifth Amendment. So when the Fifth Amendment hearing occurs, and we have that transcript in a supplemental, a separate appendix, the plaintiff presents reasons why there should be blanket invocation. And Judge Hibbler does say to the plaintiff, well, what questions would you ask? And the plaintiff's counsel tells Judge Hibbler what those questions would be. And then he says, and do you agree with the Fifth Amendment invocation? And plaintiff's counsel says yes. So at that point, that's invited error writ large. It's not appropriate to then complain that you're entitled to a new trial because the judge has issued the order you requested. But the plaintiff wanted the fact of the Fifth Amendment invocation to be put in front of the jury, right? That's correct. But in that sense, the error in terms of the adverse inference instruction, there was no error, first of all, because he didn't present an adverse inference instruction. But more to the point, the plaintiff posited three reasons for that adverse inference. And in fact, the witness's counsel argued that patronage was a reason. So there's no case in this circuit or any other circuit that holds that a plaintiff would be entitled to an adverse inference instruction as to one or two reasons that a witness might invoke the Fifth Amendment when there's a third one out there. In other words, that just allows the plaintiff not to prove his case. It allows the plaintiff to get an inference for one possible reason for Fifth Amendment invocation when there are others. And there's no case that holds that a plaintiff is entitled to an inference in such a circumstance, or in the least, that it would be what really matters here, an abuse of discretion for a judge to deny that inference. And it is particularly compelling here when the evidence in the other motion in limineus that comes before Judge Hibbler is that the reason that in terms of hiring and RIF issues, because this is all about the RIF of supervising timekeepers, that the reason a supervising timekeeper is spared the RIF is because that person is a member of the Hispanic Democratic Organization. So there is actual concrete evidence before the judge that what happened here wasn't because of ADA and workers' comp. Now that doesn't mean that the plaintiff isn't entitled to prove his case. He is. But what he was not entitled to do was to ask for an inference on ADA and workers' comp, and that was the reason he was not excluded from the RIF, because this is really about not sparing him the RIF. When there's actual evidence that the only person spared the RIF was spared for another reason, patronage, and that's why the witnesses are coming in and also saying they want to invoke the Fifth Amendment. So as to the abuse of discretion standard, there's just no case out there. And again, there's no adverse inference instruction. What would that adverse inference instruction look like even in a case like this? So that error isn't even preserved. Right, that's complicated because the validity or the reason for the valid invocation of the Fifth really didn't have a whole lot to do with the substance of this case. And so that might color the claim of error here because when it's in something of a gray area, which it is, then ordinarily we wouldn't reverse. But it seems to me that the procedure at least was unorthodox in this case in the way that it was handled. I mean, Harris does hold that the district court has discretion, and so does Evans, on how to handle these. And I would just remind the court that the plaintiff never sought this testimony. The witnesses invoked the Fifth Amendment during their depositions. The plaintiff never comes in for a motion to compel, never argues that they should be forced to testify. So from a strategic perspective, how marvelous for the plaintiff to come before the court and say, hey, yeah, I want the plaintiff to invoke the Fifth Amendment and then, on the other hand, get an adverse inference that's hurting the plaintiff when there's all these reasons that the witnesses might be invoking the Fifth. It's really not an abuse of discretion for a judge in that circumstance to say that's really the type of— especially when it is the city that comes in and says the witnesses shouldn't be invoking the Fifth. I mean, they actually opposed an argument that the witnesses shouldn't invoke the Fifth. And for that reason, it was not an abuse of discretion. And for all the other reasons, the verdict should be reinstated. Moving on to J&O v. Hillman II, the only claim at issue is retaliatory discharge under Illinois law for violation of workers' compensation—for discharging Mr. Hillman allegedly because of his workers' comp plan. And under Illinois law, Mr. Hillman was required to show actual causation between his pursuit of his workers' compensation right and his inclusion in the RIF. As the Illinois Supreme Court reiterated last year in Michael, the ultimate issue is the employer's motive, which requires a showing that those responsible for the decision were motivated by Mr. Hillman's workers' compensation claim. In the least, this requires evidence of the final decision-maker's motive. And further, unlike in federal law, there is no burden shifting on retaliatory discharge. Mr. Hillman failed to adduce any testimony from the final decision-maker, Mr. Sanchez. And for this reason alone, he failed to show that Mr. Sanchez even knew of his workers' compensation claim, let alone that it played any role in the decision to include him in the RIF. I thought there was a dispute of fact about who was the decision-maker here. I mean, there's plenty of evidence that Murphy, the supervisor, he's the deputy in the bureau. And Hennessey, the labor department representative, had discriminatory or retaliatory animus because they knew about the workers' comp, and there's evidence of their activities to punish the plaintiff. And they were responsible for placing him on the RIF list, as I understand it. And perhaps others were as well, but they're sort of the core bad actors here. And the question, as I understood it, was who actually was the decision-maker? I know the city takes the position that it was Sanchez, who's the commissioner of the Bureau of Engineering, right? He was, yes, a commissioner of Streets and Sanitation. I don't know how the city is organized. It's inscrutable to me, but anyway. Yes, he was Streets and Sanitation commissioner. Okay, so he may be in a ministerial way the final decision-maker under the city's Byzantine hierarchy, but who the actual decision-makers were is what was contested, as I understand it? Your Honor. Or is that not a correct interpretation of the record? We would disagree with that. Well, first of all, there's absolutely no evidence that Catherine Hennessy played any role in putting people on the RIF list, including Murphy. Well, she signed the letter, right? She signed the letter, but the testimony is she signed the letter because he told her she was ordered to do that. There's no evidence that the person who signs someone else's name to the letter is the decision-maker. I mean, that's really just not a rational, in our view, interpretation of the record. She is a low-level person. She's a labor liaison, and I really commend her testimony in our citations in our brief, pointing out that the plaintiff has misrepresented what her testimony was and what her role was. But you are correct that Murphy did put Mr. Hillman's name on a RIF list. The testimony, though, and the flaw in the case here under Illinois law is twofold. First, Illinois does not recognize Cat's Paw. Right. So that's a big problem because there's no showing that Murphy's influenced anything, particularly when the recommendation to include timekeepers in the RIF came on this track from the implementation of the Kronos timekeeper system, and it was the comptroller's office that said once Kronos is implemented, the city will not need this budgetary slot of timekeepers, and also KPMG consultants. So Jack Kenney, who's in the meetings about the Kronos implementation, recommends the elimination of timekeepers to Sullivan. So because the recommendation to eliminate timekeepers is coming from Jack Kenney, the plaintiff can't establish without any further testimony, without inferences, without testimony from Sanchez, that anything Murphy said had an undue influence. We know there's an independent source. We know that Kronos was implemented. We know the timekeepers were eliminated, and it's the elimination of a department. So there's no basis even under Cat's Paw to make the assumptions that the plaintiff claims he is entitled to, and it's particularly problematic as well when they don't dispute that Illinois doesn't recognize Cat's Paw on a workers' comp claim. They have to show actual motive. They have to show that even if Murphy had animus, it impacted the decision to include Hillman, and there is no evidence from which a jury could rationally make that conclusion in this case. Was the jury instructed that to prove causation, the plaintiff needed evidence that the decision-maker knew about the workers' comp claim? Your Honor, I don't think that that was a decision. I think there was an approximate cause instruction, and I would really have to check on that because, again, because there isn't Cat's Paw, I can't recall. I would have to check with the court. Right, but that's just stating the nonexistence of a Cat's Paw or imputation theory of liability in positive terms. In other words, in terms of what elements the plaintiff needs to prove in order to establish causation, but it sounds like the causation question was not broken down in that way in the jury instructions. I mean, the jury was instructed that the workers' compensation claims had to be an approximate cause for his inclusion in the RIF. So that does require a showing that the decision-makers know of the workers' comp claim. The second part is what I'm asking about. Instructing the jury on approximate cause is one thing, but instructing the jury on what that entails for a claim of this nature is another, and it sounds like the jury was not instructed that that proximate cause requirement entailed a requirement of proof that the decision-maker knew about the workers' comp claim. That was left to argument? Your Honor, I would honestly, I will have to go check the jury instruction and submit something supplemental to the court on that. But, I mean, the jury was certainly instructed on proximate cause and was instructed on the law. Was the evidence sufficient for the jury to find that Murphy was the de facto decision-maker? No, Your Honor, it was not. The only testimony is that he made a recommendation, and there was ample testimony as to the recommendation also of including all timekeepers. So Murphy makes the recommendation for BOE because Hillman is on his payroll. And remember that the instruction is eliminate people from your department, and the elimination will not affect the bottom line. Right. I mean, there's plenty of evidence to support the city's non-pretextual rationale for eliminating this job category, but the jury is entitled to reject that in the face of competing evidence from which a contrary inference can be drawn that it was motivated by retaliatory animus. So the question again becomes who's the decision-maker, and what happens to Murphy's recommendation as it's sent up the food chain? And that was plaintiff's burden of proof. It was not the city's, and that is why the plaintiff cannot prevail because they did not meet a burden of proof. All they're doing is speculating. Is there anything in the record that tells us what happened to the recommendation once it went up the food chain to Sanchez? Your Honor, not really. There's testimony from Sullivan that there was a meeting, or maybe it's from Jack Kenney, and the site is in our brief. He's the bureau? Jack Kenney is the head of administration who also recommended elimination of all the timekeepers because it came from the comptrollers and KPMG. So there's testimony that it was a collaborative process with Kenney, with Sullivan, with Sanchez, Sanchez had final sign-off. And the problem for the plaintiff ultimately in this case is there's no evidence then. They're left in the position of having no evidence then as to who was the decision-maker. They're just asking a jury to speculate at this point that Murphy's animus led to this decision. Can I ask you a question about this? Sure. Accepting the argument that Mr. Murphy's not the final decision-maker, he prepared the list, right? For BOE, he prepared recommendations, yes. And did he do that after he had given Mr. Hillman an unsatisfactory rating? He did. Yeah, and which caused the impact of his pay raise or increase. But Hillman wasn't working for him. He was working under Bresnahan, Mr. Bresnahan, wasn't he? Correct. Yeah, and not under Mr. Murphy at the BOE. Right. At the time, he gives him the unfavorable. Am I correct? Mr. Murphy's giving an unfavorable to a city employee that is not under his review. Well, the district court finds that he does that because he's told to evaluate an employee not under his review and not doing his job, and that he was credible in his testimony that he felt he could not give a pay raise to someone who wasn't doing the job in the department. Now, that happens a year and a half before Mr. Hillman is included in the RIF. And, again, I mean the mandate is put people in the RIF who aren't going to affect the performance of your department. Frankly, the person who is not working in your department but being paid out of your payroll and whose slot as a timekeeper is not going to be needed in the future because timekeepers are being eliminated and the timekeeping function is being shifted out into the field, that's unassailably logical to include that person. And what ADA and also what workers' comp requires is showing a motive of actual causation. So, you know, even if there is animus by Murphy, there's no evidence from which to conclude this decision, this inclusion of Mr. Hillman in the RIF, wouldn't have happened anyway. And that's what's needed to prevail, and that's why the city is entitled to JNOV. Did Hillman always work under that timekeeper? Because it seemed to me when his arm became disabled, he was kind of shuffled around to other places. He always held the title of timekeeper. Right, that's what I mean. He still unheld that title, but he was doing other things. Right. I mean, starting in 1995, when he's made a timekeeper, he is getting other assignments. But I see I'm running into my rebuttal time, so if the court has no further questions. If I could ask just one question about the 702 ruling on DeBrock's testimony about the pension. Sure. I was looking in the record for the chronology or to try to determine the chronology of how this ruling came about. It was excluded by Judge Hibbler from the initial trial on the basis, apparently, of what I don't know. It was just sort of a single line in the transcript saying that motion is allowed, and that he doesn't say any reason. But are we to assume that it was because of untimeliness or because of the merits that the expert didn't qualify under Daubert? I'm not sure what we're supposed to conclude about Judge Hibbler's original ruling. But then when it's raised again in front of Judge Castillo, there's a clear foundation for the ruling grounded in 702, except it's very summary. And so I'm not really sure why the decision to deny the motion in limine and allow the expert to testify was made. Does a rationale appear anywhere in the record is, I guess, my question. By Judge Castillo? Yes. Well, by either judge. For one to exclude him and one to include him. The first by Judge Hibbler, you're correct. He doesn't actually state why he's excluding it. We made several arguments, and so we reiterated those before Judge Castillo. And Judge Castillo says, well, I believe that Mr. DeBrock, as an economist, is qualified to give testimony on this issue. And that's where we raised the argument in our brief that he didn't go through the Daubert analysis of methodology, and it should have been excluded under that. Okay. Thank you, Ms. Masters. Ms. Reedy? Good morning, Your Honors. Katherine Reedy on behalf of the plaintiff. I'd like to first address the last question presented by Judge Sykes. In the ruling where Judge Hibbler barred DeBrock from testifying, the city prior to that had said this testimony should be excluded because you have already barred pension loss from the case. Therefore, Professor DeBrock's testimony is irrelevant. The city did not argue at the hearing on the motions in Luminae Rule 26. Judge Hibbler didn't bar him under Rule 26. Okay. So we can infer it was a merits-based ruling based on a finding by Judge Hibbler that the testimony was irrelevant. Correct, Your Honor. Okay. I think that's a valid argument. And then Judge Castillo's ruling? Judge Castillo determined that the city had had DeBrock's report for two years. And so under the law of the case, two circumstances had changed. One, the city had had the report since 2011. And number two, Judge Castillo had determined that pension loss was, in fact, an element of damages. And therefore, that wouldn't be a basis to exclude. Right, but what's the foundation of the 702 ruling? The methodology, you mean, whether he was a reliable witness to testify on pension loss? Right. I mean, the judge said he's qualified because he's an economist, but there's no step two and step three. I would agree that that is probably accurate. He didn't go through the exact methodology. But the methodology in this case for determining pension loss is highly complicated. No, it's really, really simple. And both Professor DeBrock and the city's witness, Jane Tesoro, used identical methodology. You take the average of the last four years of their salary. You times that by the number of years of pension service credit. And then you multiply that by an accrual rate. They used the identical formula. I mean, if a city employee can determine it, certainly a professor of economics can apply that formula. Except his prior report wasn't about pension benefits, stand-alone pension benefits. It was about wages and fringes. His initial report wasn't. His 2001 supplemental report that was an offer of proof, it was exactly on this, on pension loss. And the city had had that for two years before the second trial. I thought the 2011 supplemental just, quote-unquote, backed out the wages portion. Well, his original report was based on wages when he had done it. And in that case, at that time, we were still seeking wages. Then we had a subsequent ruling saying, because of the receipt of workers' comp, that, right? Right. And so then, but he had included fringe benefits and pension. Right. The point is that wages and fringes are separate from stand-alone pension benefits. And what was at issue in the second trial was stand-alone pension benefits. And that's what was supposed to be valued. Correct. And it was in 2011. But the 2011 report didn't address that as a stand-alone basis. It just subtracted the wages portion of it. Right. It backed out the wages and it said we're now. And the city's argument in its motion in limine is that that's not an adequate method. It's not a reliable method. There's more to this calculation than that. And Judge Castillo didn't even address that. He just summarily denied the motion in limine to exclude and didn't touch the basis. Maybe there was an argument to allow the testimony, but it simply was not addressed. I would agree he didn't go through and actually look at the methodology. Well, that's an error on its face. That's correct, Your Honor. But it was cured by the testimony of Tesaro. And at trial, they testified to using the same methodology. And in this court's ruling case, Naeem v. McCaslam, when you have another witness that corroborates the same thing, the error, if it occurred, is harmless. And so Jane Tesaro emphatically stated that if Mr. Hillman remained on the payroll until 2009, he would have 28 years of pension loss. The pension annuity, based on the accrual rate, would be $3,507.  If you do out the simple math, like in Casper, that case by the Seventh Circuit, and you multiply that by his life expectancy, 25.22 years from 2009 until the date he was expected to die, you're over a million dollars. Well, the point is, however, that if the motion in limine had been correctly handled and DeBrock would have been excluded, the city's expert would never have been put on the stand. The case would have been eliminated because there would be no damages expert. So, I mean, you could try the case, I suppose, on the emotional damage alone, but there would be no monetary, no compensatory monetary damage, and so it would be a much more truncated trial. So, you know, the only reason the city called its pension expert was in rebuttal, right, to respond to DeBrock once its motion in limine was denied. And if the motion in limine was improperly denied, that is a consequential error, seems to me. But I don't think it's a harmless error. Well, it's certainly harmful because if the motion had been denied, the case would have been tried on emotional damages only. Okay. But at the end of trial, we did a motion to reconsider damages. That was also summarily handled. I ruled on this already. We're done. I mean, that was basically the judge's ruling. I'm not revisiting my motion in limine. This is just a rehash. I don't think the 20-page opinion is summarily. That part of it. I know it's a long opinion because there were multiple, multiple post-trial motions, but the part of it having to do with revisiting DeBrock and whether he was an appropriate expert under 702 was very summary. I was looking for some rehabilitation of that ruling. That's what we ordinarily look for, but I didn't find it. Okay, but, Your Honor, at that point he had heard the methodology. The methodology was employed by the two witnesses that were the same, and the city informed Judge Castillo post-trial, that a hearing on damages is not necessary. I mean, I don't see the point of doing a rerun to go back in and call Professor DeBrock and Jane Tesoro to calculate out what the pension loss is, and the city could have called witnesses and didn't. He offered them that exact opportunity. The question is not whether a post-trial evidentiary hearing was necessary, but whether the judge had to, at some point along the way, engage in a 702 methodology. And, again, I was looking for it at some point along the way, even post-trial, and I didn't find it. The post-trial... Well, some cases have held that it's not an absolute, you know, following Daubert is not absolute in certain cases where it's... This is certainly not one of them. This is highly technical. The methodology has to be sound and has to be soundly applied, and the judge has to perform that gatekeeping function before the jury hears this. And the judge didn't do it even post-trial, so far as I can tell. And you're not convincing me that it's there somewhere. Well, it was there in the testimony at trial. It's in the report. In the report that was submitted, the methodology is in there. It's a simple formula to apply, number of years of service, time. Is it your position, then, that Judge Castillo implicitly went through the three steps because he heard the testimony? Well, and because it's in the report that was submitted to the court, and it's deposition testimony. So Daubert is satisfied without a specific three-step analysis that jumps off the record, so to speak, from the judge. Yeah, I guess that's my point, yes. Thank you. Moving into the argument on whether the verdict is against the man, that they should have been given J&OB, the evidence in this case was overwhelmingly supported by the jury's finding that the city retaliated against Mr. Hillman because he exercised his rights under the Illinois retaliatory discharge, and because he had requested medical treatment. Judge Castillo made the finding that the evidence at trial painted a clear picture that, after Mr. Hillman filed his workers' compensation claim and after he requested medical treatment, they subjected him to retaliatory job assignments, merit pay denials, and they fired him. That same overwhelming evidence establishes that the city retaliated against Mr. Hillman because he exercised his right under the ADA. Well, the judge applied the wrong legal standards in the post-trial motion, holding in his conclusions of law that the plaintiff was not required to expressly demonstrate that the RIF decision-maker knew about the plaintiff's workers' compensation claim in order for the jury to conclude that the plaintiff was discharged in retaliation for that protected activity. That's just wrong as a matter of Illinois law. Right. Well, we did not argue that that was the standard, but if the district court's right, it's right for any reason, even if it's not stated in the record, and this record clearly supports a finding by the jury that they retaliated against Mr. Hillman because he exercised his right. Who was the decision-maker? Well, shifting rationales on who the decision-maker is evidence of pretext, and then the city... It's not shifting rationales as to the reason for the placing him on the RIF list. It's a question of what is the state of the evidence about who the decision-maker was. We believe the decision-maker was Brian Murphy, but for putting him on the RIF list, Mr. Bresnahan testified unequivocally he would have remained working in the audit pound for the foreseeable future. So nobody higher up the hierarchy had any decision to make as a substantive matter once Murphy put him on the list. Is that your position? There was direct evidence where that was contradicted at trial. Catherine Hennessey was impeached on this precise point. She said and was impeached that John Sullivan was the final decision-maker, and there's no mention whatsoever of Mr. Sanchez. And then we have this motion in limine moving to bar Mr. Sanchez as irrelevant and a waste of time. That's an admission in a pleading that he's not involved or relevant. Then, I mean, the shifting decision-maker, I don't think we have to show animus as to every single one. And in the recent Illinois Supreme Court case, they said that if the trier of fact believes or doesn't believe the proffered reason given by the employer, that's determined. I'm not talking about the reason. I'm talking about the state of the record concerning who the decision-maker is. Right. We have in the state of the record of who the decision-maker is is that Brian Murphy unequivocally. I know he put him on the list. That's a recommendation. Correct. Thank you. And we have Catherine Hennessy signing his name. And I, from my recollection of this, the trial transcript, I do not believe there was any testimony that Catherine Hennessy was directed to sign that name, to sign Mr. Sanchez's name, or for that matter, that she even had authority to do that. I mean, but she did it, and that was the result was Mr. Hillman lost his job. Well, do we know from the state of the record that Murphy's decision to place him on the RIF list is not a final decision? That's what the city claims. Right. What is your evidence to the contrary? They never presented by affidavit or any testimony by Mr. Sanchez that he was. And previously, they had moved to bar his testimony in the prior trial. It's irrelevant and a waste of time. So there's nothing in the record in the second trial about Sanchez as the final decision-maker? There is from John Sullivan. And he's, what's his place in the hierarchy? He was the Deputy Commissioner of Streets and Sanitation. I probably have the wrong name, but he was Acting Managing Director of Streets and Sanitation. And he's the administrative guy, right? Jack Kenney. Okay, Kenney's the administrative guy. But he was also a witness at trial, right? Correct. Was he questioned about the city's hierarchy and who the decision-maker was? Yes, he said something about the audit department, and I think maybe Sanchez was the final decision-maker. Okay, so he testified about who actually was the decision-maker? Yes, but I mean I don't think that the jury has to believe absent witnesses who don't appear and when witnesses have been impeached on who actually was the final. Okay, let me ask this differently. How did you establish, by what evidence did you establish that Murphy was the final decision-maker? We didn't, and I don't think under Illinois law we have to establish that he was. You have to establish that the person who made the decision knew about the workers' compensation claim. If Murphy's not the person who made the decision, if he made a preliminary decision that was then reviewed several layers up the food chain and the final decision-maker didn't know, then you don't have a case under Illinois law. If they participate in the decision-making? There's no cat's paw theory. There's no imputation of animus for a retaliatory discharge. Okay, well then I would say that the other evidence in this case that would impute animus is the phony memo. You can't impute. That's my point. That's as a matter of law not allowed on a retaliatory discharge claim. There is no cat's paw theory. You can't impute Murphy's animus. I'm not trying to impute Murphy's animus. Then you have to prove that he's the final decision-maker, that nobody on up the food chain had anything to do with it other than a ministerial signing on the bottom line. If that's what the evidence showed, that they didn't actually exercise any judgment or discretion or decision-making authority but just merely signed off so that his decision was de facto the final decision, then maybe you've got a case. And I'm asking you what's the evidence of that. The phony memo was faxed into the Department of Streets. What's the evidence of his decision-making authority? Not whether he had animus. I know he had animus. I'm convinced of that. I know, but it was faxed into the entire department, placed in his official Department of Personnel file. Okay, so now you're claiming that people up the food chain did have knowledge. There was evidence, and the city never requested a jury instruction saying you have to show the final decision-maker. They never requested it, and there wasn't one. So, I mean, and then the final argument is the stated reason, even if Sanchez is the final decision-maker, the stated reason for eliminating Mr. Hillman's position did not have to be believed. No, I understand that, but you do have to show that the decision-maker knew about the workers' compensation claim. That's just a basic element in order to prove retaliatory motto. If the final decision-maker didn't know, then there's no case, and it should have been kicked on summary judgment. That's why we need to know who the decision-maker is. The decision-maker was Brian Murphy. He recommended it. There was no evidence that his recommendation was changed by anybody else. There was evidence that post-firing chief timekeepers were employed in other departments, and can I read this note for a second, Shirley? Yeah, I mean, that's what the jury instruction was, that we only had to show that Mr. Hillman was terminated, and approximate cause of it was the filing of the workers' comp claim. And this jury instruction did not require us to prove that Mr. Sanchez was it. I mean, they didn't request anything about Sanchez. They had previously moved to exclude his testimony. That's an admission, and there's no evidence that they changed anything. Let me, if I could come at it a little different than this, Marie. Is there anything in the record that establishes who, in these various departments, is the final decision-maker for the purposes of termination? Put our case aside. I just wonder whether that was entered into the evidence. Catherine Hennessey was involved in all terminations in streets and sanitation as the labor lawyer. Now, her testimony, I guess, is she was not aware of the claim, workman's compensation? Oh, yes, she absolutely claimed that, but, I mean, the documentary evidence completely refutes that, and her letters written on 12-21-2000 and January 3, 2001, are referencing his workers' compensation claim that was filed and his request for accommodation. And then she changes his job description to make him so that he's not a qualified individual anymore based on his permanent medical restrictions. I mean, in Brooks v. Pactive, this is like clear evidence of putting him in an untenable position under the Workers' Compact, and she's a labor lawyer, so she knew what she was doing. Now, let's take the opportunity because of the ADA, you mean? Pardon? See, this is the part that's confusing to me, is the ADA claim. Correct. I think especially when you look at the six key documents in this case, the city's documents themselves tie these two claims together. For example, the phone message. After he requests an accommodation, Catherine Hennessey is informed the day before by the city lawyer he's been accommodating, does not have to do repetitive work with the right arm. She writes on the message, ADA, workers' comp. Oh, it's clear she knew, and the people at that level. And it's also clear she was involved in terminations. That's very clear as well, but they weren't the... And so then she signs Sanchez's name. I mean, so that, okay, now we're getting somewhere.  Correct. I mean, in the case cited by the city of Chicago, Thompson v. Memorial Hospital of Carbondale, they said, you know, signing the name is really significant. It's not just this, you know... Was there any testimony about that practice? The practice of her signing on behalf of Mr. Sanchez? No, she didn't. I do not recall any testimony that she was told to sign his name or any of that. No, no. What I was inquiring about, perhaps not as clearly as I should, going back to my earlier question, is can we tell from the record that there's a practice where her signing on behalf of Mr. Sanchez was the course that was followed in cases of termination? Not in this case. In U.S. v. Sanchez, there's evidence that numerous people, including Jack Drumgold and John Sullivan, had the authority to sign his name, but not in this particular case. That evidence did not come out, I believe. But it's clear that she had the authority to sign his name. Well, then she had the authority to be clearly involved in termination. She's clearly involved, and the question is authority. And that's what we're claiming this case was, a termination, not a writ. I mean, Mr. Hillman's job had nothing to do with it at all. Right. It has the same functional effect, but, again, focuses on who is the actual decision maker. And if it was just a – I haven't seen this form in the record, but is it just a form with Sanchez's name on it, but she's the one who actually executes it? She signed L. Sanchez's name and initialed it. And then initialed it. Correct. And did you argue that an inference can be drawn, that that makes her with the others at that level, the decision makers? We absolutely argued it in closing, I know. I mean, was there a jury instruction on that point? No, Your Honor, I don't believe so. It was just the standard IPI jury instruction under Illinois law for retaliatory discharge and proximate cause. The judge ruled on the ADA claim, right? Yes, he did. And ruled in favor of the city, right? Correct, Your Honor. But I think these same facts and documents compel the exact same finding under the ADA. So that's a – it ought to be to some extent, because the judge, they seem to be almost intertwined, and maybe there is some big distinction between the Wilkerson's comp retaliation as opposed to the no retaliation in the ADA. Right. Well, I think that they are intertwined in their own documents. The first 40 pages of the opinion, the findings of fact, which are not in dispute, compel a finding in plaintiff's favor on both counts. And I think that the court misconstrued and only looked at the ADA claim until September 1 and excluded all other evidence of retaliatory animus. It didn't. It's the fact that it's, I guess, a way of solving the drumroll. I think they were limited in testifying for whatever reason, which they say was brought on by them. But that was part of the reason why they got in the trial, wasn't it? Because they were excluded? Correct, Your Honor. They were excluded without even – I mean, inference aside, once the witness had been excluded under the Fifth Amendment, at a bare minimum, we were allowed to tell the jury or call them as witnesses and have that Fifth Amendment be told to the jurors, even without an adverse inference. And then the city not only did that, they entered into evidence, drumrolled documents, and we couldn't tell the jury they asserted the Fifth Amendment. So there were a myriad of reasons why Judge Castillo said that was an error, and it wasn't simply based on this adverse inference instruction. And we did an offer of proof, once again, asking for the adverse inference that was denied. But do you see my lights on? Yeah, you may make a concluding remark. Thank you, Your Honor. Under the jury instructions as given in this case, the jury, which the city did not tender any different ones, the jurors were clearly free to find in favor of Mr. Hillman on this retaliatory discharge claim. And for that reason, I would request that the court affirm Judge Castillo. Thank you. Thank you, Ms. Reedy. Ms. Masters. Just briefly, I want to address some of the statements Ms. Reedy made and then move on to the ADA claim. The statement that Ms. Tesoro corroborated DeBrock's testimony is just really unequivocally not true. Ms. Reedy just said that she testified that Mr. Hillman qualified for 28 years of pension. That's not true. That she also testified it was years of service that mattered for the calculation. That is not true. It's pension credit years that mattered. But Mr. DeBrock used years of service. The testimony that the statement that Ms. Hennessey testified that John Sullivan was the final decision maker, also not correct. And we have a citation in our brief, in our response reply, where we quote Ms. Hennessey's testimony. And, of course, John Sullivan was on the stand and could have been asked those questions. The question some of you asked about who told Ms. Hennessey to sign John Sanchez's names to the document, also in the record. I think we have the cite to that in one of our briefs. And I believe it was either John Drumgold or Sullivan who came to her and said to sign those letters. Also, the complaint that John Drumgold relied on documents in the first trial that sort of made this problem, made a problem, I should say, with the adverse inference. I want to point out, as we do again in our reply brief, that the plaintiff actually stipulated to the admission of some of those documents and their objection to the other ones was based on untimely disclosure. Was that part of the reason for getting a new trial? Right. Because they didn't testify? They did not testify. Okay. And Judge Castillo found that to be error. Did they testify in the second trial? Yes, they did. Was this brought up? Were there any objections or were there any requests of taking the Fifth Amendment? In the second trial? No. Did the issue come up at all? In the second trial about the Fifth Amendment? No. But that was the reason they were at least kept out of the first one? Correct. And that's why they got a second trial? Correct. But it didn't come into the second trial, their prior Fifth Amendment invocation. On the ADA retaliation claim, I want to point out to the court that the only claims for retaliation were the merit pay denial and the RIF. It's not anything about denial of merit of medical treatment. It's not anything about his job assignments. And, in fact, I think it's important to bear in mind that the plaintiff brought an ADA accommodation claim and the jury found in the city's favor on the accommodation issue. Plaintiff's argument on appeal basically is that the court should have drawn inferences in his favor, and they cite a lot of summary judgment law, but the standard on review on the ADA findings because it was a bench trial is clear error, and there was no clear error. I see that my time is up. I would ask that the court reinstate the verdict from Helmand 1. If not, grant JNOV in Helmand 2 or the other relief request in our brief, and we would also ask that the ADA judgment be upheld. Thanks very much. Thank you, Ms. Messrs. Thanks to all counsel. The case is taken under advisement.